**M. James SPITZER and Leonard Lichter, as Trustees Under Agreement dated May 10, 1987, Plaintiffs,**

v.

**SHANLEY CORPORATION, Shanley Production Company, Shanley Oil Company, Shanley Energy Company, John Shanley, and Neal McCabe, Defendants.**

**No. 89 Civ. 8549 (MEL).**

United States District Court,
S.D. New York.

Dec. 15, 1994.

Spitzer & Feldman P.C., New York City (Ronald J. Offenkrantz, of counsel), for plaintiffs.

Cheryl B. Wattley P.C., Dallas, TX (Cheryl B. Wattley, of counsel), for defendants.

LASKER, District Judge.

Norstate Limited Partnership was created in Oklahoma for the purpose of investing in oil and gas wells in Oklahoma and Texas. Norstate's general partner, Shanley Production Company, is a wholly-owned subsidiary of Shanley Corporation, a Delaware corporation whose former CEO, Neal McCabe, is the sole defendant to have gone to trial in this action brought by Norstate's limited partners. The limited partners allege, among other things, that as a former director of both Shanley Production and its parent company, McCabe is subject to liability for conversion and for breach of a fiduciary duty owed the limited partners. The case against McCabe has been tried to the bench. I find the following facts and reach the following conclusions of law.[1]

## FACTS

Leonard Lichter and M. James Spitzer, partners in the law firm Spitzer & Feldman, are trustees of a trust created for the benefit of the Norstate limited partners.

Neal McCabe was chairman of the board of Shanley Corp. from March, 1981 until 1988. Before 1986, he was named Shanley Corp.'s CEO. McCabe was also chairman of the board of Shanley Production from the time of its acquisition in 1983 until 1988.

During the relevant period, the Norstate Limited Partnership owned property that included producing oil and gas wells, whose operating profits were paid to the general partner, Shanley Production. Shanley, in turn, was to distribute a percentage of these proceeds to the limited partners.

1. With the exception of summations, no transcript of the proceedings was ordered by either party to this action. Accordingly, transcript references are not available.

As noted above, Norstate's sole general partner after 1983, Shanley Production, was a subsidiary of Shanley Corp., then called Shanley Oil Co. The officers of the parent and subsidiary companies were nearly but not absolutely identical. Because one of the questions to be resolved in this action is whether McCabe reasonably relied upon the decisions of the companies' other officers, it is appropriate to describe their qualifications and roles within the business.

McCabe, chairman of the board and CEO of Shanley Corp., and chairman of Shanley Production, was in charge of acquisitions for Shanley Corp. A licensed securities broker with prior experience at Salomon Brothers, his duties at Shanley included the identification of companies to be acquired by the parent corporation and the negotiation of such acquisitions. In fact, Nord Petroleum, the company which later became Shanley Production, was identified for acquisition by McCabe, who was the main Shanley representative in negotiations with Nord (Lichter testified that, during these negotiations, McCabe asked him about the Norstate Limited Partnership and the willingness of the limited partners to make contributions to it). Where necessary, McCabe also structured the financing of acquisitions by Shanley Corp.

John Shanley, president of Shanley Corp. and CEO of Shanley Production, founded Shanley Corp. Shanley was formerly a vice-president of corporate finance at Salomon Brothers, where he met McCabe. As the founder and top officer of Shanley Corp., John Shanley did not have a single, well-defined area of responsibility, but was responsible for the overall direction of the enterprise and reporting to the SEC.

William Alstrin, chief operating officer of Shanley Corp., was formerly president and chief operating officer of a Dallas bank.

Dan Denton, the chief financial officer of Shanley Corp., is and was a CPA with experience at Peat, Marwick & Mitchell and within the oil and gas industry. He was the main accounting official at Shanley, with a staff as numerous, at its peak, as 25. When Denton

left Shanley in late 1986, he was replaced by Tom Cook, formerly the comptroller at Shanley Corp. Cook had experience in both finance and oil and gas.

Frank Lokash, the "land man" at Shanley Corp., was president of the Dallas Land Man's Association.

### Partnership Accounting

All proceeds from the Norstate properties were remitted to Norstate's general partner, Shanley Production, which deposited the funds in a Fidelity National Bank account that was one of Shanley Corp.'s general bank accounts. From such accounts, Shanley Corp. paid its business expenses, including rent, payroll, geological costs, and well expenses. Neal McCabe was a signatory on this account and on all Shanley accounts.

A bank account in the name of Norstate Limited Partnership was also maintained by the Shanley group. It was from this account that Shanley Production distributed Norstate proceeds to the limited partners, suggesting that Shanley Corp. periodically transferred Norstate well proceeds from the Fidelity account to this Norstate account.

Every few months, money from the Norstate account was paid to the limited partners for distribution of profits earned by partnership wells. The distribution checks were signed by McCabe and other Shanley Corp. executives. Although rubber signature stamps and electronic signatures were sometimes used by Shanley employees, a comparison of McCabe's signatures on copies of several different checks demonstrates that McCabe signed the distribution checks personally on at least some occasions. See Ex. Z.

These procedures were followed without incident through 1985, at which point Shanley Production ceased making distribution payments to the limited partners.[2]

### Cash Calls

From time to time, "cash calls" were made upon the Norstate partnership. These were calls by Statex, a company engaged to main-

---

**2.** One distribution payment was made by Shanley to the limited partners in September, 1986.

Ex. 12. However, this was a late payment of 1985 profits.

tain and operate the Norstate wells, to advance funds for partnership purposes such as the financing of drilling or well development. Each owner, or partner, was required to pay an amount proportionate to his or her ownership interest in the well to be improved. Owners who did not respond to a given cash call were deemed "nonconsenting". A nonconsenting owner was excluded from certain "participation" in the relevant well, and was not entitled to the distribution payments received by "participating" owners. Shanley Production, as Norstate's general partner, notified the limited partners as to cash calls for any of the Norstate wells.

McCabe did not participate in decisions related to the development of the wells owned by the Norstate Partnership. Nor did he decide when cash calls would be paid by Shanley Production for any of the Norstate wells.

In late 1985, Shanley Production was notified of a cash call for the development of a well known as the "Payne 20". Alstrin testified that when he relayed the call to Lichter, as agent for the limited partners, Lichter stated that the limited partners would not advance funds to the partnership until money already owed to them by Shanley Production was distributed. Lichter testified, however, that although he refused on behalf of the limited partners to put up any new money, he did authorize Alstrin to pay the cash call on behalf of the limited partners and to subtract that amount from the total owed them by Shanley Production. It is not necessary to reconcile these accounts: In any event, it is clear that Alstrin considered Lichter's response to be a refusal to consent to the cash call, although neither he nor anyone else notified the limited partners that they had been classified as "nonconsenting".

**The Lincoln 50**

Among the properties owned by Norstate was a group of Oklahoma wells known as the "Lincoln 50." In 1985, Shanley Corp. received an offer from Meridien Reserve, Inc. to purchase the Lincoln 50. In December of that year, a Shanley executive notified Lichter of Meridien's offer and successfully solicited the limited partners' permission to make the sale.

Beginning in December, 1985, Lichter periodically phoned various Shanley officers, not including McCabe, to ascertain the status of the Lincoln 50 sale. On each occasion, he was told that no sale had been made, and no sale proceeds were noted on the monthly statements generated for partnership accounting. In fact, however, as Lichter learned from Denton in late 1986, Norstate's interest in the Lincoln 50 was sold to Meridien in March of that year for $306,618.90.

The Lincoln 50 sale proceeds were deposited into one of Shanley Corp.'s general corporate accounts. No money derived from the sale was or ever has been transferred to the Norstate account or paid to the limited partners. In fact, no 1986 or 1987 partnership revenues of any kind were paid to the limited partners.

**Shanley's Cash–Flow Crisis and the DeSoto Transfer**

By the summer of 1986, neither Shanley Corp. nor Shanley Production was able to meet its debts as they matured.

At an unspecified date during that summer, Denton had a telephone conversation, which he taped, with Lichter, during which Lichter demanded money owed the limited partners and threatened legal action. Shortly thereafter, the taped conversation was played during a meeting of Shanley Corp.'s board of directors at which McCabe presided. McCabe admits that he heard the tape and was aware of the plaintiffs' claims, but took no action with respect to them.

In August, 1986, Shanley Corp. received a request from the Bank of DeSoto for funds to cover incoming checks. The amount requested, several hundred thousand dollars, represented "all or most" of the funds Shanley had available to it. Dan Denton, Shanley Corp.'s chief financial officer, testified, without challenge, that after discussing the bank's call for the immediate deposit with one of the bank officers, Denton went to John Shanley and McCabe to describe the situation and to seek their authorization for a wire transfer. McCabe, along with Shanley, accepted Denton's recommendation and permitted the transfer. The largest sum wired to DeSoto was withdrawn from the Fidelity

National account which held Norstate Limited Partnership funds. At the time, Denton believed that after the money was transferred to DeSoto, it could be wired back to the various original accounts 24 hours later. However, Denton had proceeded on a false assumption and, after the money was transferred to DeSoto, the bank refused Denton's request to withdraw it the next day.

McCabe testified that although he is unable to recall DeSoto's deposit request or Denton's discussion with him about it, he may have authorized the wire transfer. He admits that he was notified, within a week of the transfer, of the bank's refusal to return the funds.

In January, 1987, after making unsuccessful written demands for distribution payments owed the limited partners,[3] and having recently learned of the March, 1986 sale of the Lincoln 50, Spitzer and Ronald Offenkrantz, a member of his firm, flew to Shanley Corp.'s headquarters in Dallas to meet with Shanley representatives concerning the undistributed proceeds.

At a meeting attended by Shanley, Alstrin, and McCabe, the representatives of the limited partners were told that the partnership funds had been "glommed down on" by a bank, whose name was not disclosed. McCabe left the meeting five minutes after it began, and testified that he did not hear this portion of the conversation.

### The 1986 Norstate Tax Return

Garrett Vogel, a Dallas accountant engaged to prepare the 1986 Norstate Limited Partnership tax return, calculated that as of December 31, 1986, the limited partners were owed approximately $897,000 (the sum for which they are presently suing) by Shanley Production. A letter from Vogel dated June 19, 1987, accompanied by a copy of the prepared return, was sent to Neal McCabe's office. Ex. 30.

On July 27, 1987, John Shanley signed the tax return on behalf of Shanley Production. Ex. 19.

On July 31, 1987, Tom Cook, who replaced Denton as Shanley Corp.'s chief financial officer in early 1987, sent a memo to McCabe and Shanley, stating that, in his opinion, Vogel's calculations were accurate, and Shanley Production owed the limited partners $897,862.57. Ex 8.

That month, McCabe and Shanley were visited in Dallas by Offenkrantz, who threatened legal action. McCabe, upset by the encounter, spoke to Shanley about it later in the day. Apparently referring to the status of the limited partners with respect to the Payne 20 cash call, Shanley said that there was a disagreement about the amount owed to the limited partners. He assured McCabe that he was "handling it." McCabe thereafter made no inquiries about money owed the limited partners.

### The December 1987 Agreement

In December, 1987, John Shanley, acting on behalf of the general partner, entered into an agreement to transfer specific oil and gas properties to the limited partners in satisfaction of the debt owed them by Shanley Production.

The limited partners never discussed the December agreement with McCabe before it was executed by Shanley. After the agreement had been signed, McCabe was informed by three Shanley executives, Neil Toler, Tom Cook, and John Shanley, that the transferred properties more than adequately compensated the limited partners, but McCabe did not investigate the adequacy of the settlement himself.

Subsequently, the limited partners discovered that a significant number of the properties named in the December agreement had been previously pledged as security for loans made to Shanley Corp. and its subsidiaries.

### CONCLUSIONS OF LAW

The limited partners seek damages resulting from, among other things, a breach of the

---

**3.** The first demand, dated September 2, 1986, was sent to McCabe, Shanley, Alstrin, and Denton. See Ex. 9. Denton responded a week later, assuring the limited partners that he was undertaking an accounting. See Ex. 10. Later that month, Shanley Production remitted $40,000 of 1985 well proceeds to the limited partners, who were unsatisfied, as is evidenced by a letter sent to Denton from Offenkrantz, dated November 21, 1986. See Exs. 12 and 13.

fiduciary duty owed them and conversion of partnership assets by Shanley Production.[4] They maintain that as chairman of the board of Shanley Production, Norstate's general partner, and as an officer and director of Shanley Production's parent company, McCabe had a duty to become and remain informed about Shanley Production's obligations with respect to the Norstate partnership and to assure that those obligations were carried out. McCabe argues that as a director whose day-to-day responsibilities did not include oversight of the Norstate operations, he was entitled to rely upon the information and assurances given him by other Shanley officers and directors.

■■■ Before the legal propriety of McCabe's behavior can be measured, however, it is necessary to determine which state's law controls. The Norstate Limited Partnership was created under the laws of Oklahoma. Shanley Production, its general partner, is a Texas corporation whose parent, Shanley Corp., is a Delaware corporation. In light of the fact that the fiduciary duty at issue was created by a partnership formed in Oklahoma, it is appropriate to apply Oklahoma law to determine McCabe's personal responsibility as a director of Shanley Production for any breach by the corporate general partner. The law of the state in which an entity is formed or incorporated governs the nature and extent of that entity's fiduciary obligations and liability for violations of the law. *See, e.g., Maywalt v. Parker & Parsley Petroleum Co.*, 808 F.Supp. 1037, 1059 (S.D.N.Y.1992) (Fiduciary duties created by a limited partnership agreement are to be interpreted according to the law of the state in which the partnership was created). Furthermore, McCabe has invoked Oklahoma law by arguing that the Oklahoma limited partnership act "incorporates the general corporate statutes," to which he looks for support. Summation Tr. at 34.

■■■ Under Oklahoma law, a fiduciary duty plainly existed between Shanley Production, Norstate's sole general partner, and the Norstate limited partners. *See Oklahoma Co. v. O'Neil,* 440 P.2d 978 (Okla.Sup.Ct. 1968) (A partner occupies a fiduciary position and owes a higher and greater duty to members of the partnership than he owes to one with whom he deals at arms length).

The precise moment at which Shanley first breached its fiduciary duty to the limited partners is unclear. Certainly, Shanley's failure to notify the limited partners of the sale of the partnership's interest in the Lincoln 50 wells—and to forward a share of the sale proceeds—was a breach of the duty it owed them. Similarly, the transfer of partnership funds to the Bank of DeSoto to cover checks written by Shanley Corp. constituted conversion and breached Shanley Production's fiduciary duty to the limited partners. The question to be resolved, however, is not whether Shanley Production breached its fiduciary duty to the limited partners, but at what point, if any, Neal McCabe may be held liable for losses to the limited partners caused by any such breach.

■■■ To support the proposition that he properly relied upon other executives to handle Shanley Production's fiduciary responsibilities, McCabe cites 18 O.S. § 1027(E), which states,

> "a member of the board of directors, or a member of any committee designated by the board of directors, in the performance of his duties, shall be fully protected in relying in good faith upon the record of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such officer's, employee's, committee's, or other person's competence, and who have been selected with reasonable care by or on behalf of the corporation."

McCabe argues that he acted reasonably in relying, as he claimed he did, upon the exper-

---

4. Plaintiffs also allege civil RICO violations in their second amended complaint. Because they were unable to demonstrate that McCabe intended to defraud the limited partners, however, the elements of a civil RICO violation were not proved. Moreover, plaintiff did not argue at trial that they were.

tise of Shanley, Denton and Alstrin and upon Shanley's assurances that he would "handle" the partnership obligations. The evidence does establish that Shanley Production, like its parent company, employed well-qualified and experienced officers. It also seems probable that McCabe's duties, as agreed among Shanley, McCabe, et al., did not include oversight of day-to-day well operations or partnership business and accounting. At the time Shanley Corp. acquired the general partner interest in the Norstate partnership in 1983, then, McCabe's reliance on others to conduct the Norstate partnership business may have been reasonable. However, the critical question remains whether McCabe's continued reliance on his co-directors and officers *throughout* the period of time complained of by the limited partners was reasonable.

Under Oklahoma law, "an officer or director of a corporation is personally liable for the wrongful use of funds entrusted to it if ... being ignorant of wrongdoing, he is negligent in failing to learn of and prevent it." *Preston–Thomas Const., Inc. v. Central Leasing Corp.,* 518 P.2d 1125, 1127 (Okla. App.1973). Moreover, the "[e]xistence of circumstances and facts which would arouse the suspicions of an ordinary prudent business man will furnish a basis for the personal liability of an officer or director who fails to make reasonable inquiry and act with due care regarding the suspicions." *Id.* In *Preston–Thomas,* two officers of a corporation were found liable for conversion of money held in trust by the corporation, despite the fact that no actual knowledge that the money was not corporate property was shown on the part of the officers. The court concluded that because the corporation had no income of its own, the officer defendants "had to know deductively that the money was being received by the corporation as a trustee.... As handlers of the constructive trust fund appellants were obliged to discover the terms of the trust and comply therewith." *Id.* at 1127–28.

In the present case, McCabe either knew or should have known, by August, 1986, when he, along with John Shanley, authorized a wire transfer to DeSoto Bank of several hundred thousand dollars, nearly all funds available to Shanley Corp., that some of the money transferred did not belong to Shanley. McCabe was the person responsible for the acquisition of the corporation that served as Norstate's general partner, and at that time, as indicated above, he actually questioned Lichter about the obligations of the limited partners. McCabe signed distribution checks made out to the limited partners. Moreover, at or about the time of the DeSoto transfer, he heard the tape recording of the conversation between Denton and Lichter, in which Lichter, representing the limited partners, protested that money was owing to them.

Even giving McCabe the benefit of the doubt where the evidence is ambiguous, it is clear that he was aware, or should have been, that, at the time of the transfer request, Shanley Corp. bank accounts held funds belonging to the limited partners. The urgent request by DeSoto to transfer nearly all Shanley Corp. funds, coupled with the knowledge that Shanley Production held money in trust for the Norstate partnership, was sufficient to "arouse the suspicions of an ordinary prudent business man" that funds held in trust were being mishandled. Under *Preston–Thomas,* these circumstances triggered McCabe's duty to act. McCabe's failure to investigate the situation to determine whether any of the funds were held by Shanley Production in trust for the partnership—as he clearly knew, or should have known, they were—and his allowing the funds to be used solely for the benefit of the Shanley group rendered him personally liable for the losses to the limited partners caused by his inaction from that point forward.

\*　　\*　　\*

Accordingly, I conclude that Neal McCabe is liable to the plaintiffs for such damages as they incurred from and after the time of Shanley's wire transfer to DeSoto Bank in August, 1986 as a result of McCabe's breach of fiduciary obligations as described above.

Plaintiffs are requested to submit, in writing, their calculations of damages, and defense counsel shall, within 20 days of their

receipt, submit McCabe's response to plaintiff's calculations.